IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:21-mj-160 |
| | ) | |
| BERNARD LEJON JENKINS, JR. | ) | **UNDER SEAL** |
| | ) | |
| | ) | |
| Defendant. | ) | |

AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANT

I, Bernard Mensah, being duly sworn, depose and state as follows:

**INTRODUCTION**

1.   I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since May of 2017. I am currently assigned to the ATF Washington Field Division's Group II. My assignments include investigating individuals who are involved in the illegal possession and transfer of firearms, violent crimes involving firearms, and narcotics and firearms trafficking. I have conducted and participated in electronic surveillance operations, executed search warrants and arrest warrants, developed sources of information, and conducted international operations that collaborated with foreign law enforcement entities.

2.   The facts in this affidavit come from personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. All observations not personally made by me were relayed to me by individuals who made them or are based on my review of reports, documents, and other evidence obtained during the course of

1

the investigation. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. Based on my training and experience, and the facts set forth in this affidavit, there is probable cause to believe that Bernard Lejon JENKINS Jr. ("**JENKINS**") and unknown co-conspirators have committed violations of 18 U.S.C. § 924(a)(1)(A) and 2 (knowingly making a false statement in relation to the purchase of a firearm), § 922(a)(5), (6) and 2 (transfer of firearm to another person without license) among other crimes.

## PROBABLE CAUSE

*Initial Firearm Recoveries and Identification of JENKINS*

4. Since January 2020, law enforcement has been investigating certain firearms purchases within the Eastern District of Virginia involving **JENKINS**. As part of this investigation, ATF generally and I specifically have reviewed multiple ATF Form 4473s, Firearm Trace Summaries, video surveillance footage and interviewed several Federal Firearm Licensees (FFLs). On March 6, 2020, I reviewed a Firearm Trace Summary listing **JENKINS** as the purchaser of a SCCY Industries, 9mm caliber pistol bearing serial number 735113, (hereinafter "GUN A"). GUN A was recovered from a vehicle occupied by a Washington, D.C. resident, J.K., during and in relation to a crime and arrest in Chesterfield, Virginia. GUN A was recovered just 28 days after purchased by **JENKINS**.

5. A review of Chesterfield Police Department (CPD) arrest paperwork showed J.K. was arrested with R.F., A.N., and two other individuals.

6. In furtherance of this investigation, I also reviewed another Firearm Trace Summary listing **JENKINS** as the purchaser of a Taurus, G2S, 9mm pistol bearing serial number TMA03417 (hereinafter "GUN B"). GUN B was recovered by the Metropolitan Police

Department (MPD) during an arrest of an individual on December 31, 2019, in Washington, D.C., just 36 days after it was purchased by **JENKINS** in Virginia.

*Interview of FFLs and Review of ATF 4473 Forms*

7.      On March 10, 2020, agents retrieved records from All Star Pawn and Gold in Fredericksburg, Virginia, for **JENKINS'** firearm purchases on August 12, 2019, November 25, 2019 and January 9, 2020.  The forms showed that **JENKINS** purchased a Taurus 9mm pistol on each occasion.  On August 12, 2019, **JENKINS** purchased a Taurus, PT908, 9mm pistol bearing serial number TMC00900D (hereinafter "GUN C").  On November 25, 2019, **JENKINS** purchased GUN B and on January 9, 2020, **JENKINS** redeemed from pawn, a Taurus, G2S, 9mm pistol bearing serial number TMC16742 (hereinafter "GUN D"). When asked by the staff if they remembered **JENKINS**, the licensed federal firearm dealer stated he distinctly remembered **JENKINS** because he was always talkative and polite.  He further remembered **JENKINS** as the passenger in the car every time **JENKINS** visited the store.  He stated that **JENKINS** never drove. Furthermore, **JENKINS** was occasionally accompanied by another individual when he visited the store.

8.      Also on March 10, 2020, agents retrieved records from Fredericksburg Gold and Pawn in Fredericksburg, Virginia, for **JENKINS'** firearm transactions. The records showed on August 12, 2019, **JENKINS** purchased a Taurus, PT140, .40 caliber pistol bearing serial number SCM71445 (hereinafter "Gun E").  On January 2, 2020, **JENKINS** purchased a SCCY, CPX-2, 9mm pistol bearing serial number 793154 (hereinafter "GUN F").  A review of records showed phone number "202-421-8699" written down as **JENKINS'** number.

9.      After that visit, agents traveled to Dance's Sporting Goods in Colonial Heights, Virginia, to retrieve records and video surveillance footage of **JENKINS'** transactions. Records

showed on March 6, 2020, **JENKINS** purchased a Glock 29, 10mm pistol bearing serial number BKWZ460 (hereinafter "GUN G") and a Glock 30, 10mm pistol bearing serial BMPN616, (hereinafter "GUN H"). On February 11, 2020, **JENKINS** purchased a Glock 43x, 9mm pistol bearing serial number BMNH154 (hereinafter "GUN I") and a Glock 30s, .45ACP pistol bearing serial number BGHR727 (hereinafter "GUN J"). On January 29, 2020, **JENKINS** purchased a Glock 27, .40 caliber pistol bearing serial number BKWX819 (hereinafter "GUN K") and a Glock 30, .45ACP pistol bearing serial number BKXB058 (hereinafter "GUN L"). On October 19, 2019, **JENKINS** purchased an SCCY, CPX-1, 9mm pistol bearing serial number 807327 (hereinafter "GUN M") and GUN A, the SCCY pistol which initiated the investigation into **JENKINS**. On September 20, 2019, **JENKINS** purchased a Glock 27, .40 caliber pistol bearing serial number KMY505, (hereinafter "GUN N"). On the same day, in a different transaction, **JENKINS** purchased a Taurus, G2S, 9mm pistol bearing serial number TMC16742 (hereinafter "GUN O").

10. On the last visit of the day, agents retrieved records of **JENKINS**' transactions from The Smoking Gun FFL, located in Colonial Heights, Virginia. Records showed on September 20, 2019, **JENKINS** purchased a Taurus, 709, 9mm pistol bearing serial number TJU03813 (hereinafter "GUN P").

11. Upon review of each ATF Form 4473s from the firearm transfer in this case, it was noted that **JENKINS** checked "Yes" in Block 11a, which states "Are you the actual transferee/buyer of the firearm(s) listed on this form?", affirming that he was the actual transferee/buyer of the firearm listed on line 1 of Blocks 24 through 28 on the forms. Block 14 of each ATF Form 4473 was signed by **JENKINS**, certifying that his answers in Section A were true, correct, and complete. Furthermore, **JENKINS** listed his address as 81 Country Manor

Court, Fredericksburg, Virginia 22406.

*Phone Conversations with Monica Jenkins and JENKINS*

12. In an attempt to locate **JENKINS** and gather additional information, agents traveled to **JENKINS**' listed address on Country Manor Drive in Fredericksburg, Virginia. On March 23, 2020, agents interviewed the resident of the address on Country Manor Drive. Agents encountered the resident while conducting surveillance and attempting to locate **JENKINS**. The address was listed on **JENKINS**' Virginia Identification card and was also the same address used on his ATF Form 4473 for each of his firearm purchases. The resident informed agents that he was the new owner of the house and purchased it less than two weeks ago. He provided agents with the previous owner's phone number. I called the number and a woman later identified as Monica Jenkins answered. I explained to Ms. Jenkins that I worked with Stafford County Police and wanted to locate **JENKINS** for questioning related to an investigation. In order not to compromise the investigation, I did not tell Ms. Jenkins that I was a Special Agent with the ATF.

13. I asked Ms. Jenkins if **JENKINS** lived with her on Country Manor Drive, Fredericksburg, VA and she stated, "No he doesn't but what is the investigation for?" I explained to Ms. Jenkins that since **JENKINS** is not a minor, law enforcement would not be able to divulge certain information. Ms. Jenkins asked me if she could call back.

14. Shortly after, Ms. Jenkins called and asked if she could have **JENKINS** call me himself. I agreed and gave Ms. Jenkins my information. After the exchange, Ms. Jenkins told me they sold the house at the wrong time because the Coronavirus stalled the purchase of their next home. Prior to ending the call, I asked if **JENKINS** lived with her and she said no. Ms. Jenkins said he visited occasionally and his mail came to the house, but **JENKINS** had not lived with her since he graduated high school. She stated he attended Virginia State University and

now comes and goes as he pleases.

15. At approximately 3:00 PM, **JENKINS** called me from 631-912-5801, and asked what the inquiry was about. I told **JENKINS** that law enforcement needed to question him regarding an investigative matter. **JENKINS** agreed to meet with law enforcement but needed to call his mother before proceeding. At approximately 3:56 PM, **JENKINS** called me with Ms. Jenkins on the line and agreed to meet with law enforcement but only if his attorney was present. I asked them to have their attorney make contact.

*Review of Surveillance Footage from Dance's Sporting Goods*

16. On March 22, 2020, I reviewed security footage from Dance's Sporting Goods. The video was provided to ATF by the store manager. Video surveillance showed **JENKINS** purchasing GUN K and GUN L on January 29, 2020. The video began at approximately 2:12 PM on January 29, 2020, when a silver Audi sedan with no front license plate, parked (backed in) in the back row of Dance's Sporting Goods' parking lot. **JENKINS** and two unidentified males exited the vehicle. **JENKINS** and another rear passenger entered Dance's Sporting Goods while the other subject returned to the front seat of the parked Audi sedan.

17. Shortly after, **JENKINS** and the unidentified male wearing a black hoodie, proceeded to the handgun case located in the rear of the store. After observing and manipulating some firearms, **JENKINS** and the unidentified individual exited the store. At approximately 2:21 PM, the two men returned to the silver Audi sedan. At approximately 2:23 PM, **JENKINS** and the unidentified individual exited the vehicle and returned to the handgun counter. At the counter, **JENKINS** interacted with a store clerk and filled out paperwork.

18. At approximately 2:45 PM, **JENKINS** and the unidentified individual proceeded to the checkout counter where **JENKINS** is observed paying for the two Glock pistols with cash.

After the transaction is completed, the store clerk placed both pistols in separate bags and handed one to the unidentified individual and the other to **JENKINS**. Prior to leaving, the store clerk handed both men baseball caps. Shortly after, **JENKINS** and the unidentified individual both entered the rear passenger compartment of the vehicle and the vehicle departed the parking lot immediately after.

19. On March 28, 2020, I reviewed a second video surveillance footage of **JENKINS** purchasing GUN I and GUN J on February 11, 2020. The video began at approximately 2:22 PM on February 11, 2020 when a grey Toyota Camry sedan with no front license plate, parked (backed in) in the back row of Dance's Sporting Goods' parking lot. The vehicle parked in the same manner and in a similar location as the silver Audi sedan which transported **JENKINS** on his January 29, 2020 purchase. Furthermore, I noticed there were multiple vacant parking spots directly in front of the store.

20. The interior cameras of the store showed **JENKINS** at the handgun counter, filling out paperwork. **JENKINS** is observed talking on his cellphone at the handgun counter. Furthermore, he was holding and referencing his cellphone while completing the firearms forms. At approximately 2:25 PM, **JENKINS** is observed repeatedly counting cash at the handgun counter. At approximately 2:29 PM, **JENKINS** is observed walking towards the front entrance of the store. He abruptly stopped walking and began manipulating his cellphone. After a short pause, **JENKINS** referenced his cellphone and returned to the firearm section of the store. At approximately 2:36 PM, **JENKINS** proceeded to the checkout counter where **JENKINS** is observed paying for the two Glock pistols with cash. After the transaction is completed, the store clerk placed both pistols in a clear bag and **JENKINS** is seen departing the store.

21. At approximately 2:41 PM, **JENKINS** walked back to the grey Toyota Camry

holding a clear bag with two Glock pistols inside of it. **JENKINS** entered the rear driver's side of the vehicle and shortly after, the vehicle departed the parking lot.

22. I then reviewed video surveillance footage from Dance's Sporting Goods of **JENKINS** purchasing ammunition on February 25, 2020. The video began at approximately 4:22 PM on February 25, 2020 when **JENKINS** and two unidentified males entered the front entrance of the store and proceeded to the firearm section. After browsing the handgun section, **JENKINS** and the two unidentified individuals left the area. At approximately 4:44 PM, the three men proceeded to the ammunition section of the store. At approximately 4:45 PM, one of the unidentified individuals pointed at a specific box of ammunition which **JENKINS** retrieved from the shelf. **JENKINS** then proceeded to the checkout counter where he paid for the ammunition with cash.

23. After the transaction was complete, **JENKINS** and the two unidentified individuals departed the store. Dance's Sporting Goods did not provide video footage of the parking lot for this transaction date. An employee at the store told me he was unable to locate a vehicle the group traveled to the store with.

24. I finally reviewed video surveillance footage from Dance's Sporting Goods of **JENKINS** purchasing GUN G and GUN H on March 6, 2020. The video began at approximately 4:57 PM on March 6, 2020, when a dark colored sedan with no front license plate visible in the video, parked (backed in) in the back row of Dance's Sporting Goods' parking lot. Once again, the vehicle was parked in a similar manner as the previous vehicles which transported **JENKINS** to Dance's Sporting Goods. Three unidentified males exited the vehicle and walked to the front entrance of the store. The driver, the front seat passenger and the rear passenger side passenger exited the vehicle together. At approximately 5:06 PM, the three unidentified individuals

returned to the vehicle empty handed.  At approximately 5:09 PM, **JENKINS** exited the rear driver's side of the vehicle and walked toward the front entrance of the store.

25. Interior Cameras showed that at approximately 5:25 PM, **JENKINS** is observed at the handgun counter filling out paperwork. Shortly after submitting the paperwork to a clerk, **JENKINS** pulled out a handful of cash from his pocket and began counting.  At approximately 5:39 PM, **JENKINS** proceeded to the checkout counter where **JENKINS** is observed paying for the two Glock pistols with cash.  After the transaction is completed, **JENKINS** took possession of the Glock pistols from the store clerk.  **JENKINS** grabbed each gun box with his hands and exited the store holding the firearms without a bag.

26. At approximately 5:45 PM, **JENKINS** is observed walking back to the vehicle with two Glock boxes; one in each hand. The firearms were not in a bag as he entered the rear driver's side of the vehicle. Shortly after, the vehicle departed the parking lot.

*Recovery of Firearm within Twenty-Three Days after Purchase and NIBIN Analysis*

27. On March 30, 2020, ATF received information regarding a third recovered firearm purchased by **JENKINS**. MPD police report stated on March 29, 2020, an individual attempted to evade law enforcement by fleeing. After getting stopped, MPD officers recovered GUN G in his flight path.  GUN G was purchased on March 6, 2020 from Dance's Sporting Goods.  The recovered pistol was recovered just 23 days earlier.

28. GUN G was of particular interest to law enforcement because ATF's National Integrated Ballistic Network (NIBIN) confirmed two "hits" for Gun G.  Specifically, on March 10, 2020, GUN G was used in an Assault with a Deadly Weapon involving two victims in Southeast Washington, D.C.  GUN G was then used again five (5) days later on March 15, 2020, in a Sounds of Gunshots incident in D.C. before finally being recovered by law enforcement on

March 29, 2020.

### Virginia Firearm Tracing Center Notification and Firearm Interdiction

29. On April 28, 2020, ATF Washington II agents were notified by the Virginia State Police (VSP) Firearms Transaction Center (FTC) that **JENKINS** was attempting to purchase three more firearms from Dance's Sporting Goods in Colonial Heights, Virginia. Store employees informed ATF that **JENKINS** attempted to purchase 3 Taurus G2Cs on April 24, 2020, but the FFL refused to sell to him because they suspected he was straw purchasing. On April 28, 2020, **JENKINS** returned to the FFL and attempted to purchase two Taurus G2C pistols. Agents were able to have the FTC and the FFL delay the transaction until the following morning.

30. On April 29, 2020, ATF Washington II agents and Task Force Officers established a surveillance at the FFL and observed **JENKINS** arrive, accompanied by two additional individuals. Following the transaction, agents approached **JENKINS** and attempted to interview him, but he requested legal counsel and declined to speak to agents. Agents identified the two individuals that were with **JENKINS** and discovered that both were DC residents associated with the recovery of GUN A. After consulting with the USAO EDVA, agents seized both firearms and **JENKINS**' cellphone pending the opportunity to seek a search warrant from this Court. In addition to straw purchasing, **JENKINS** is suspected of using an incorrect address on his ATF Form 4473. To date, **JENKINS** has purchased approximately 18 firearms in the Eastern District of Virginia, 3 of which have been recovered by law enforcement in the possession of DC residents.

### Review of Recovered Firearm in Arlington, Virginia

31. On May 27, 2020, I reviewed ATF Firearm Trace Summary listing **JENKINS** as the purchaser of a "GUN H". The firearm was recovered in the possession of Washington, D.C.

resident, A.R. in Arlington, Virginia with a 57-day time to crime.

32. I reviewed Arlington County Police Department (ACPD) Arrest Packet and discovered the firearm was recovered on May 2, 2020 during an arrest and investigation for a stolen vehicle. Among other offenses, A.R. was arrested and charged with Carrying a Concealed Weapon.

*Review of JENKINS' Seized Cell Phone Pursuant to Search Warrant*

33. On May 6, 2020, the Honorable United States Magistrate Judge Ivan Davis signed search warrant 1:20-SW-538 in the Eastern District of Virginia. I reviewed the downloaded data recovered from **JENKINS**' cellphone and discovered numerous conversations, pictures, videos and references to the straw purchase, acquisition, sale and transfer of firearms to a convicted felon and residents of Washington, D.C.

34. On October 6, 2020, I reviewed a cell phone search warrant for an iPhone 8 attached to AT&T telephone number 804-997-9390. The number and phone on the account were previously identified as belonging to **JENKINS**. **JENKINS** is known to his acquaintances and friends as "Minkey".

35. Between January 1, 2020 and April 29, 2020, **JENKINS** contacted numerous individual accounts via text message in order to sell, advertise, broker and discuss the acquisition of firearms. On February 5, 2020, **JENKINS** wrote "Aye ask Troy to take us back cuz bought the wrong Bullet's I'm trying go back they close at 7" to phone number 202-421-8xxx, an unknown individual stored in **JENKINS** phone as "DQ".  Law enforcement databases associated 202-421-8xxx to T.L; with an apartment address on Ames Street NE, Washington, DC 20019.

36. On April 26, 2020, an individual associated with email account "blou1738@icloud.com" contacted **JENKINS** at 804-997-9390. blou1738@icloud.com texted,

11

"And my address is 800 southern ave se". **JENKINS** responded, "…this shit going off my ride they ain't trying leave without they irons I gotchu brudda I got some extra shit for U for u waiting". **JENKINS** continued, "I know u want ya iron I'm coming bro"… "2 full clips for u red tips ima look out for u appreciate ya patience". Based on training and experience, agents know the term "Iron(s)" is street terminology commonly used to represent firearms. On April 29, ATF interdicted two (2) pistols from JENKINS at Dance's Sporting Goods in Colonial Heights, Virginia. Furthermore, 800 Southern Ave, SE, is located in Washington, DC.

37. On April 12, 2020, an individual saved in **JENKINS'** phone as "Leek" contacted **JENKINS** from phone number 202-322-1xxx. "Leek" texted, "Wassup brodie what the dogs going for". **JENKINS** responded, "Nina's going for a cool 3-320 glock 550+ or better glocks n ninas nun in between my brother"…"My man Got a joint rn 350 Nina everything come with her". Law enforcement databases associated AT&T number 202-322-1xxx to M.W.W; with an apartment address on Downing Street NE, Washington, DC 20018. Based on training and experience, agents know the term "Nina(s)" is street terminology for smaller pistols. Furthermore, the term "Dog(s) and Dawg(s)" are also street terminology for firearms.

38. On April 8, 2020, JENKINS sent the below picture to an individual saved in his phone as "Blou" associated with 202-702-2xxx.



39. On April 17, 2020, **JENKINS** texted, "Yo bruv I'm waiting for them folks to call me and tell me pick up". Law enforcement databases associated 202-702-2xxx to an address on Webster Street, NE, Washington, DC.

40. On April 2, 2020, **JENKINS** contacted an individual saved in his phone as "Dk", associated with phone number 757-339-2xxx. JENKINS asked "Dk" if he could purchase a firearm with an obliterated serial number. **JENKINS** texted, "See if one ya people can grab me a Taurus". The individual responded, "I asked him for me he told me he need $200 cs he don't fw that Shit frfr I can try to talk him down tho". **JENKINS** then stated, "Yeaaa do that for me fr he can scratch the serial off to"…"Idc bout him being green I'll pay and still scratch the serial off". Law enforcement databases associated 757-339-2xxx to D.L.D. Law enforcement databases also confirmed D.L.D. is a convicted felon.

41. On March 27, 2020, an individual associated with phone number 202-378-8xxx, later identified as I.L.W. texted **JENKINS** requesting two pistols for $600. The individual asked, "If I send you 6 you can get 2 G2 40s". **JENKINS** responded, "Yea" "My man got a joint for 3 whenever u ready den I'll just get one from the store or some tomorrow". The individual texted, "Ite it's a G2 40 ?". **JENKINS** confirmed, "Yea all black hold 14 +1". Subsequently, the individual confirmed and agreed to send payment. On March 28, 2020, **JENKINS** offered the individual some Glock pistols as well. **JENKINS** texted, "That's a lock this for the drake ain't it other one ARP" "this one for the ARP" "Youngin got some glocks as well". The individual responded, "ARP" "Wats the price on the Glocks?" The next day, the individual informed **JENKINS** of Dance's Sporting Goods' hours of operation. Throughout the following days, **JENKINS** and the individual discuss the acquisition of multiple firearms and the transfer of funds through an electronic payment platform called Apple Pay.

42. On April 6, 2020, **JENKINS** and the individual discussed the lack of firearms for sale at local Federal Firearm Licensees (FFLs). **JENKINS** texted, "No word on handguns I'ma test my luck and go in the store myself if i make it back before 5 I'm leaving after this online

13

class over wit" "U going be inna crib"…"U checked inna store already?" The individual texted, "I checked online they ain't have no 40s" "You put that $120 on the Apple Pay yet?" After struggling to find firearms for sale at FFLs, the individual asked **JENKINS** to acquire an AK-47 variant pistol. The individual texted, "Imma just wait ain't no need to look wat they ain't got wassup slim wit the Draco?" **JENKINS** replied, "He holding that for me still" "I talk to that nigga everyday". The individual asked, "It's a regular one or micro?" "Either way I want it". **JENKINS** replied, "Mini" and sent picture below.



43. On April 27, 2020, **JENKINS** texted, "Everything locked u can send it in the morning if u want to just be sure u up by like 10 at the latest". The individual texted, "Ite fasho Ima send it hit me when you get up". On April 28, 2020, the individual and **JENKINS** attempted to go purchase firearms from Dances Sporting Goods. **JENKINS** was unable to purchase the pistols that day. On April 29, 2020, JENKINS returned to Dance's Sporting Goods to retrieve the pistols. ATF interdicted two (2) Taurus G2 pistols from JENKINS that day.

44. On February 21, 2020, an individual associated with 727-224-4xxx contacted JENKINS about a firearm. They discussed electronic payment and the CashApp username, "$Cokayne98" was listed. **JENKINS** texted, "Say no more you got the pic I sent right". The

individual texted, "Yea send it again doe cuz dat shit disappeared". **JENKINS** then sent below picture.



45.     On April 16, 2020, **JENKINS** texted, "I'm onna way to buy more ninas rn I'll stop grab your 3 n bring u a joint back" "How u trying act brother" "I'm be passing the burg in like a hour". The individual replied, "Bro I been trynna buy sum flame off u for a minute u keep wantin me to give u da bread first and u still ain't bring me da gun like wassup bro wen u get da jawn in hand bring it to me I'll cop I already sent u 40 for sum dat never came I'm not finna keep puttin bread out u bring it to me I got u cash in hand bro but I can't send no bread off dats how shit get lost in transition" "Y we can't jus hit da pawn shop like last time I got wheels u kno I'll look out I jus can't keep losing bread". The individual complained to **JENKINS** asking why they no longer conducted business like they previously did. **JENKINS** explained to the individual that he could no longer purchase firearms for individuals without receiving the money first because it caused issues. **JENKINS** texted, "A nigga snitched not to long ago dem ppls was at my door looking for me that's literally the only reason I ain't been in the pawn shop since nah I feel allat respect I only do the money first cuz sometimes I don't be having enough to buy the joint on spot next time I do get extra joint in hand ima let you know". Prior to purchasing firearms from FFLs in Colonial Heights, Virginia, **JENKINS** purchased firearms from pawn shops in Fredericksburg, VA.

46.     On January 23, 2020, an individual associated with email address

charlesashton30@yahoo.com asked **JENKINS**, "What can I get for 170 from you"? **JENKINS** replied, "Like gas or glick?" "The term "Gas" is common street terminology for marijuana and the term "Glick" is terminology for a pistol similar to a Glock. The individual texted, "Glick" and **JENKINS** replied, "Shit I ain't got one myself u need atoeast 210 fr for a 9". The individual asked for a picture and **JENKINS** replied, "The Taurus Jawnt I had look up dancers sporting goods" and then sent the below picture. The individual agreed to purchase the pistol and **JENKINS** requested cash.



47. On April 16, 2020, phone number 202-560-8xxx associated with M.J.K., acquaintance of **JENKINS**, contacted **JENKINS** asking for an AK-47 variant pistol. **JENKINS** and the individual discuss a price for the firearm. On April 25, 2020, the individual asked for a Glock 26 or a Glock 19 pistol. M.J.K. drove **JENKINS** to Dance's Sporting Goods on April 29, 2020. He was detained and interviewed during the interdiction.

48. On January 18, 2020, **JENKINS** and an individual associated with 202-321-5xxx discussed acquiring a firearm from a store. The phone number was associated with S.B., an individual arrested on December 31, 2019 in possession of GUN B. JENKINS texted, "Bouta go get another Jawnt inna morning". Based on my knowledge and experience, I know the term "Jawnt" or "Joint" is common street terminology for a firearm. The individual informed JENKINS that he wanted to go to the store with him.

*Instagram Communications Discovered in JENKINS' Cellphone*

49. A review of the Instagram data located on **JENKINS'** cellphone determined that on April 12, 2020, Instagram username, m_jenkins12 contacted Instagram user YungSheem in regards to the acquisition of firearms. M_jenkins12 wrote "9 for 4". YungSheem replied "g-lock ?" m_jenkins12 stated, "No sir. A 9 glocks onna street going for that high number everything coming with this tho"…"I was going get it but I'm fuck around tax a nigga if he try get it off me".

50. Based on my training and experience, I know that the firearm possessed by B.A.S. at SSG Tactical constitutes a firearm pursuant to Title 18, United States Code, Section 921(a)(3), and was not manufactured in the Commonwealth of Virginia; therefore, this firearm traveled in, and/or affected interstate commerce.

*Instagram Search Warrant Return Review for m_jenkins12*

51. On April 22, 2021, I reviewed results from an Instagram search warrant (1:21-sw-103) executed on user account "m_jenkins12" belonging to **JENKINS**. While reviewing the data, I discovered posts, direct message conversations and pictures related to firearms, drugs and other illegal activity. The Instagram search warrant sworn to by your affiant on February 23, 2021, in the Eastern District of Virginia by the Honorable Michael Nachmanoff.

*FIREARMS CONVERSATIONS*

52. After multiple Instagram video calls between JENKINS and "1yunggsheem", JENKINS and "1yunggsheem" began Direct Messaging each other. In that conversation with Instagram account user, "1yunggsheem" on April 12, 2020, JENKINS wrote, "9 for 4". "9 for 4" referred to a 9 millimeter pistol on sale for $400. "1yunggsheem" responded, "g-lock ?". JENKINS stated, "No sir. A 9 glocks onna street going for that high number everything coming

with this tho ". JENKINS continued, "I was going get it but I'm fuck around tax a nigga if he try get it off me (emoticon)".

53. The next Instagram conversation between JENKINS and "1yunggsheem" continued on May 12, 2020 when "1yunggsheem" asked, "so you got my paperwork ?...if imma rat?" JENKINS responded, "I'll get to paperwork when I get to it boys got u sounding sweet. Yea u rat in my eyes till proven other wise I ain't got shit else to say to u 69". ATF agents interdicted firearms and seized JENKINS' phone on April 29, 2020, at Dance's Sporting Goods in Colonial Heights, Virginia, due to evidence of firearms trafficking. Agents know the term "rat" is street terminology for a person who cooperates with law enforcement or testifies in court against a defendant. The term "69" is reference to a New York rapper named Tekashi 69 who testified in Federal Court against members of the Nine Trey Bloods Gang set. JENKINS referred to "1yunggsheem" as "69" in this conversation.

54. The two continue to argue and threaten each other in subsequent messages. "1yunggsheem" stated, "yeaa aight keep my name out your mouth slim pull me up goofy ass or stfu you ain't goin touch me foh…you ain't got no paperwork bruh stop spreading false shit niggaz don't play like that where i'm from bruh & imma keep this energy when you see me (emoticon)". JENKINS responded, "Tipping and straight paperwork different y'all geeked on paperwork I think you tippin! And yea I hope u do young nigga ima get witchu I'm off this". **JENKINS** told "1yunggsheem" that he believed "1yunggsheem" tipped off the police, therefore, **JENKINS** would not be able to produce court records for "1yunggsheem's" formal cooperation with law enforcement.

55. After discussing the price of drugs in a conversation with Instagram user "iam_quanp" on September 20, 2019, **JENKINS** asked, "U know who got a glick? I know the

term "glick" is common street terminology for a small pistol and/or Glock pistol. "iam_quanp" responded, "Not nun for sale rn". **JENKINS** then asked if anyone was selling any in his area and "iam_quanp" stated, "I can see Richmond hot rn niggas keeping they guns". Your affiant knows the term "hot" is street terminology for a contentious area or an area under law enforcement investigation.

*NARCOTICS AND MARIJUANA CONVERSATIONS*

56. Throughout **JENKINS'** Instagram account, he coordinated multiple narcotic and marijuana transactions with numerous individuals. In a conversation with "wallahionme" on September 30, 2020, **JENKINS** wrote, "After I get some weed I'm back on no kizzy hold up". In a conversation with "pc_mosthated" on November 25, 2020, JENKINS wrote, "Lemme get 2 grams of that I got some za but I want dat!" Your affiant knows the term "Za" is street terminology for exotic marijuana. In a conversation with "jerro_fi", **JENKINS** wrote, "Shit my feel up bouta find some weed or some no kizzy". On February 22, 2021, "jerro_fi" asked, "What You got the gas", and **JENKINS** responded, "Yeaa". "Jerro_fi" asked, "Za?" and **JENKINS** responded, "Yea and a couple bags of some koo Shit". Your affiant knows the term "gas" is street terminology for potent marijuana. In a conversation with "DONHUSTLA" on January 1, 2020, **JENKINS** asked, "U still got Ercs?" "DONHUSTLA" responded, "How many u need" and **JENKINS** wrote, "How much for 100"? "DONHUSTLA" gave JENKINS a price of $700. Your affiant knows the term "Ercs" is common street terminology for Oxycodone brand Percocet.

*BANK and CREDIT CARD FRAUD CONVERSATIONS*

57. In a conversation with "kanseco", JENKINS asked about his network of scammers. On August 21, 2020, JENKINS asked "kanseco", "Who u be fw that be scamming"? "Kanseco" responded, "myself find the chimes". Later in the conversation, JENKINS stated, "Got all the

19

methods for saks fifth cashapp methods western union all of it I'm tellin ya (emoticon)". The two continued to discuss additional details pertaining to defrauding credit cards, cashapp and banks. Chime is a financial technology company which works in the similar manner as online banking institutions.

58. In another conversation with "alias.zi", **JENKINS** wrote, " Or the cashapp joint either or I got both". "Alias.zi" responded, "Ard bet send me your chime routing and account # your birthday, ssn, and full name". **JENKINS** wrote, "248107657996, July 2nd xxxx, xxx-xx-9436, Bernard Jenkins". "Alias.zi" also asked for **JENKINS'** email address and **JENKINS** responded with, minkeyjenkins@icloud.com.

59. Your affiant checked with the Virginia Employment Commission for all reported wages for **JENKINS**. The only reported income for **JENKINS** was $546 for the first quarter of 2020.

## CONCLUSION

60. Based upon the foregoing, I submit there is probable cause to believe that between October 2019 and April 29, 2020, within the Eastern District of Virginia, Bernard Lejon JENKINS Jr. and known and unknown coconspirators committed violations of 18 U.S.C. §§ 922(a)(5), (6), 924(a)(1)(A) and 2, among other crimes.

Respectfully submitted,

*Bernard C. Mensah*

Special Agent Bernard Mensah
Bureau of Alcohol, Tobacco, Firearms and Explosives

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on May 6, 2021.

Digitally signed by Michael S. Nachmanoff
Date: 2021.05.06 11:07:59 -04'00'

Hon. Michael S. Nachmanoff
United States Magistrate Judge